IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Roanoke Division

| | | |
|---|---|---|
| PAUL C. THOMPSON, | ) | |
| Plaintiff, | ) | Civil Action No. 7:17-cv-00111 |
| | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| H.W. CLARKE, et al., | ) | By:   Joel C. Hoppe |
| Defendants. | ) | United States Magistrate Judge |
| | ) | |

Plaintiff Paul C. Thompson, a Virginia prisoner appearing pro se, filed suit under 42 U.S.C. § 1983, alleging that several prison officials violated his constitutional rights while he was housed at Red Onion State Prison ("ROSP") in 2015. *See generally* Verified Compl., ECF No. 1. The matter is before the undersigned for a Report and Recommendation "as to whether the defendants and other prison officials played a part in Thompson's failure to exhaust" his administrative remedies before bringing his remaining claims to federal court. Mem. Op. on Defs.' Mot. for Part'l Summ. J. 6, ECF No. 45.

I. The Legal Framework

"The Prison Litigation Reform Act ('PLRA') requires that inmates exhaust all available administrative remedies before filing an action challenging prison conditions in federal court." *Woodhouse v. Duncan*, 741 F. App'x 177, 177 (4th Cir. 2018) (citing 42 U.S.C. § 1997e(a)(1)). This "requirement applies to all inmate suits about prison life," *Porter v. Nussle*, 534 U.S. 516, 532 (2002), and federal courts do not have discretion to waive it or to excuse a plaintiff's failure to exhaust administrative remedies that were otherwise available to him, *see Ross v. Blake*, 136 S. Ct. 1850, 1855–59 (2016). The PLRA also "'requires proper exhaustion,' which 'means using all steps that the agency holds out, and doing so properly,' to allow the agency a full and fair opportunity to address the issues on the merits." *Woodhouse*, 741 F. App'x at 178 (emphasis

1

omitted) (quoting *Woodford v. Ngo*, 548 U.S. 81, 90, 93 (2006)); *see also Jones v. Bock*, 549 U.S. 199, 217–18 (2007).

This "exhaustion requirement hinges on the 'availability' of administrative remedies: An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones." *Ross*, 136 S. Ct. at 1859 (brackets omitted). A remedy is "available" when it is "'capable of use' to obtain 'some relief for the action complained of.'" *Id.* (quoting *Booth v. Churner*, 523 U.S. 731, 738 (2001)). Conversely, a remedy is not available when:

> (1) "it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) it is "so opaque that it becomes, practically speaking, incapable of use"; or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."

*Woodhouse*, 741 F. App'x at 178 (quoting *Ross*, 136 S. Ct. at 1859–60). These are the "three kinds of circumstances" where the Supreme Court has recognized that "an administrative remedy, although officially on the books, is not capable of use to obtain relief" in the prison context. *Ross*, 136 S. Ct. at 1859. "When the facts on the ground demonstrate that no such potential exists, the inmate has no obligation to exhaust the remedy." *Id.*

A prisoner's "failure to exhaust is an affirmative defense under the PLRA." *See Jones*, 549 U.S. at 216. Thus, defendant-prison officials must plead and prove that their agency had a procedure "capable of use to obtain some relief for the action complained of," *id.*, and that the prisoner-plaintiff "failed to take advantage" of that procedure before bringing his claim to federal court, *Washington v. Rounds*, 223 F. Supp. 3d 452, 459 (D. Md. 2016). *See Jones*, 549 U.S. at 218–24. If a defendant makes this showing, the burden shifts to the plaintiff to demonstrate, by a preponderance of the evidence, that the administrative remedy was not actually "available" to

him because he was prevented, "through no fault of his own, . . . from availing himself of it."[1]

*Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008); *see Graham v. Gentry*, 413 F. App'x 660, 663 (4th Cir. 2011). The PLRA's express "limitation on an inmate's duty to exhaust . . . has real content," *Ross*, 136 S. Ct. at 1858, and federal courts are "obligated to ensure that any defects in exhaustion were not procured from the action or inaction of prison officials," *Hill v. O'Brien*, 387 F. App'x 396, 400 (4th Cir. 2010) (quoting *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007)).

## II. Background

In March 2017, Thompson filed a Verified Complaint alleging that several ROSP officials violated his constitutional rights in the first few months after he arrived there in late March 2015. ECF No. 1. After the Court granted in part the Defendants' motion to dismiss and motion for summary judgment, Thompson's remaining § 1983 claims allege that: (1) on April 6, Defendant Officer Crabtree used excessive physical force against Thompson, in violation of the Eighth Amendment, when he sprayed Thompson in the face with pepper spray for no apparent reason; (2) on June 17, Defendant Mgr. Swiney[2] failed to protect Thompson from violence at the hands of his cellmate, also in violation of the Eighth Amendment; and (3) Defendants Mgr.

---

[1] "[E]xhaustion of administrative remedies under the PLRA is a question of law to be determined by the judge," *Drippe v. Tobelinski*, 604 F.3d 778, 782 (3d Cir. 2010), and "judges may resolve factual disputes relevant to the exhaustion issue without the participation of a jury," *Woodhouse*, 741 F. App'x at 178 (brackets omitted) (quoting *Small v. Camden Cty.*, 728 F.3d 265, 271 (3d Cir. 2013)). Where, as here, "the plaintiff survives summary judgment on exhaustion, the judge may resolve disputed facts concerning exhaustion, holding an evidentiary hearing if necessary." *Turner v. Clelland*, No. 1:15cv947, 2016 WL 6997500, at *12 n.16 (M.D.N.C. Nov. 30, 2016) (quoting *Dillon v. Rogers*, 596 F.3d 260, 273 (5th Cir. 2010)), *adopted by* 2017 WL 913630 (M.D.N.C. Mar. 3, 2017). Such questions of law arising in prisoner civil rights actions also may be referred to a magistrate judge for factual development and preparation of a report making proposed findings of fact, conclusions of law, and a recommended disposition of the issue. *See, e.g.*, *Woodhouse*, 741 F. App'x at 178–79.

[2] Unit Manager Swiney is listed as "Swenney" on the docket.

3

Younce, Mgr. Swiney, Lt. Adams, Sgt. Large, Officer Crabtree, and Sgt. Fleming[3] retaliated against Thompson for filing grievances, in violation of the First Amendment, when they "variously pepper sprayed him, deprived [him of] informal complaints and/or legal materials, moved him into a cell that had pepper or OC spray on the toilet, caused him to be assaulted by another inmate, and charged him with false disciplinary action." Mem. Op. on Defs.' Mot. to Dismiss 13, ECF No. 47; *see* Mem. Op. on Defs.' Mot. for Part'l Summ. J. 6–15; Defs.' Resp. to Order of Sept. 3, 2018 ("Defs.' Resp. to Order") 2–3, ECF No. 53.

Defendants asserted that Thompson failed to exhaust his available administrative remedies with respect to these claims. *See* Defs.' Br. in Supp. of Mot. for Part'l Summ. J. Ex. 1, Aff. of J. Messer ¶ 11, ECF No. 23-1; Answer 2, ECF No. 52; Defs.' Resp. to Order 3. They maintained that "Thompson had access to" all the necessary paperwork, but he never submitted "any informal complaints or grievances" alleging "that OC spray or excessive force was used [against] him on . . . April 6, 2015," or that "he was assaulted by another offender on June 17, 2015." Messer Aff. ¶ 11. Thompson, on the other hand, attested that Mgr. Younce, Lt. Adams, and Sgt. Large refused his "multiple requests" for Informal Complaint forms in the spring of 2015 and threatened him when he raised these concerns in letters to Warden Barksdale. Verified Compl. ¶¶ 27–28, 46–48.[4] He also claimed that Sgt. Fleming took away the Informal Complaint

---

[3] Sgt. Fleming is listed as "Flemming" on the docket.

[4] These paragraphs contain Thompson's sworn allegations "based upon his own personal knowledge and set[ting] forth specific facts admissible in evidence," *Williams v. Griffin*, 952 F.3d 820, 823 (4th Cir. 1991). *See* Verified Compl. 80. Thus, the Court may treat those allegations as affidavit evidence in determining whether Thompson carried his burden of persuasion. *See Ajaj v. United States*, 479 F. Supp. 2d 501, 517 n.4 (D.S.C. 2007) (citing *Williams*, 952 F.3d at 823); *cf. Kaba v. Stepp*, 458 F.3d 678, 686 (7th Cir. 2006) ("The affidavits of the prison officials and Kaba's other grievances and filings merely turn this into a dispute with competing evidence, requiring a factfinder to evaluate the credibility of the witnesses and other evidence in the record."); *United States v. Stevens*, 813 F. Supp. 2d 758, 765 (W.D. Va. 2011) (noting that an evidentiary hearing on motion under 28 U.S.C. § 2255 was appropriate where "the opposing affidavits created material disputes of fact," and weighing petitioner's hearing testimony against his prior sworn statements in making a credibility determination).

forms that Thompson could have used to report the June 17 incident. *See id.* ¶¶ 74, 77.[5]

The presiding District Judge found a "genuine dispute of material fact as to whether the defendants and other prison officials played a part in Thompson's failure to exhaust" with respect to his two remaining Eighth Amendment claims. *See* Mem. Op. on Defs.' Mot. for Part'l Summ. J. 5–6. Defendants later acknowledged that the same dispute existed with respect to Thompson's First Amendment retaliation claim. *See* Defs.' Resp. to Order 3. On May 6, 2019, I held an evidentiary hearing so that I could assess witness credibility, *see Hill*, 387 F. App'x at 400–01 (collecting cases), and prepare a Report and Recommendation for the presiding District Judge about whether any of Thompson's remaining claims should be dismissed under 42 U.S.C. § 1997e(a)(1), *see Strickland v. Wang*, No. 7:11cv358, 2013 WL 866075, at *1 & n.2 (W.D. Va. Mar. 7, 2013). The relevant evidence in the record is summarized below.[6]

A.     *Affidavits & Documentary Evidence*

Defendants submitted an affidavit from J. Messer, the Institutional Ombudsman at ROSP, describing the Virginia Department of Corrections' ("VDOC") formal prisoner grievance process. Messer Aff. ¶ 1. The *Offender Grievance Procedure* in effect during the relevant time consisted of two policy documents: (1) Operating Procedure 866.1, which established a state-wide administrative process for resolving most "issues and complaints" that affect inmates; and (2) an Implementation Memorandum, which provided institution-specific information about staff responsibilities and institutional processes under that operating procedure. *See generally* OP 866.1 §§ I, IV(A), IV(M) (July 1, 2013), ECF No. 102-1.

---

[5] *See supra* n.4.

[6] Before the hearing started, Thompson moved to compel discovery and to postpone the evidentiary hearing. I denied Thompson's oral motions, but gave both parties ten days to submit additional evidence relevant to the exhaustion issue.

The grievance procedure "is a mechanism for offenders to resolve complaints, appeal administrative decisions[,] and challenge the substance of procedures." Messer Aff. ¶ 4. "All issues are grievable," *id.* ¶ 5, so long as they "affect the grievant personally" and do not concern "[d]isciplinary hearing decisions, penalties and/or procedural errors . . . ; State and Federal court decisions, laws, and regulations[; p]olicies, procedures, and decisions of the Parole Board, Board of Corrections, Virginia Department of Transportation . . ., and other agencies[; or] other matters beyond the control of the DOC," OP 866.1 § IV(M)(1)–(2). "Grievances must be submitted within 30 calendar days from the date of the incident." Messer Aff. ¶ 6; *see* OP 866.1 § VI(A)(1).

Before submitting a formal grievance, an inmate must "demonstrate that he . . . made a good faith effort to resolve the issue informally. This good faith effort shall be documented using an Informal Complaint . . . except where operating procedures specifically state that other documentation may be used for the informal process. . . ."[7] OP 866.1 § V(B)(1). The inmate "is responsible for submitting the Informal Complaint in a timely manner to allow time for staff response within" the thirty-day period before he must file a Regular Grievance. *Id.* § V(B)(2). The inmate also must attach specific documentation—either a receipt or written response—to his Regular Grievance, showing that he submitted an Informal Complaint about the same incident. *See id.* § VI(A)(2). The facility's Implementation Memorandum specifies how or where inmates can obtain Informal Complaint forms; explains how, where, and to whom they should submit those forms; and identifies the staff positions "designated to log" and "responsible for responding to" Informal Complaints. *Id.* § V(B)(4); *see* ECF No. 102-1, at 2–3.

On summary judgment, the parties presented conflicting affidavits describing how ROSP inmates could obtain Informal Complaint forms during the relevant time. *Compare* Messer Aff. ¶

---

[7] Those exceptions are not relevant here.

6

11, *with* Verified Compl. ¶¶ 27–28, 46–49, 74, 77. In November 2017, Messer attested that "informal complaint forms are available all day every day in all housing units, including segregation, and in the medical unit." Messer Aff. ¶ 11. If an inmate "is assigned to segregation and needs a grievance form or an informal complaint form, he may ask a correctional officer or other staff for the form, and it will be provided to him." *Id.*

Thompson, on the other hand, attested that he could not ask just any ROSP staff member for an Informal Complaint ("IC") form. *See* Verified Compl. ¶ 5. In Thompson's experience, "only ROSP staff [ranked] sergeant or above" would give those forms to inmates. *Id.*; *see also* Pl.'s Sworn Obj'n to Aff. of J. Messer ¶ 8, ECF No. 84. Those officials "require offenders (Thompson) to disclose the issue and the ROSP staff involved prior to [providing] any IC. If the issue involves them or their staff, they flat-out refuse to provide the IC." Verified Compl. ¶ 77. Thompson has been housed at nine different VDOC facilities over the past fourteen years, but he "never encountered a policy such as sergeants and above are the only staff an offender may obtain an IC from" before he arrived at ROSP in March 2015. *Id.* ¶ 78. "Thompson repeatedly requested IC from [Mgr.] Younce, [Lt.] Adams, and [Sgt.] Large and Defendants failed to provide IC for the incident[] occurring on . . . April 6, 2015. Multiple requests were made during the thirty (30) day filing period. Defendants dragged out their issuing IC until the lapse of the filing deadline." Verified Compl. ¶ 46; *see also id.* ¶ 179.

On April 14, 2015, Thompson executed a notarized affidavit stating that he had "been denied access to a variety of forms such as Informal Complaints ('IC'), grievances, . . . [and] request forms" since arriving at ROSP three weeks earlier. Pl.'s Supp'l Br. Ex. PT-1, Aff. of P. Thompson ¶ 4, ECF No. 82-1. He had received four request forms, but no Informal Complaint or Grievance forms. *Id.* Thompson also wrote letters to Warden Barksdale about an incident

7

involving Sgt. Large and OC spray that occurred on March 27, one day after Thompson arrived at ROSP. Verified Compl. ¶¶ 25, 27. "On April 6, 2015, Defendants Younce, Adams, and Large talked to Thompson at his cell door" and told him to stop writing letters to Warden Barksdale. *Id.* ¶ 27. They "threatened Thompson with various negative consequences," including disciplinary charges that might extend Thompson's term of incarceration, if he kept writing letters.[8] *Id.* ¶ 28; *see also id.* ¶¶ 35–36. About an hour later, Officer Crabtree "sprayed Thompson in the face with OC spray." *Id.* ¶ 29.

On July 7, 2015, about two weeks after Thompson's cellmate allegedly attacked him, Thompson met with Counselor Huff and Sgt. Fleming. Verified Compl. ¶ 74. "Thompson requested multiple IC," and Sgt. Fleming gave him two or three forms "in front of Huff." *Id.* Once Huff left the office, however, "Sgt. Fleming took them away from Thompson and ordered [him] back to his cell." *Id.* Thus, Thompson maintains that "[t]he only reason [he] did not file [an] IC or grievance concerning . . . April 6, 2015 and/or June 17, 2015 is that [his] requests for IC were denied." Pl.'s Sworn Obj'n to Aff. of J. Messer ¶ 12.

Lt. Adams and Mgr. Younce each submitted an affidavit stating in relevant part, "I do not interfere in the offenders' ability to file lawsuits or their access to courts." Defs.' Br. in Supp. of Mot. for Part'l Summ. J. Ex. 3, Aff. of G.D. Adams ¶ 10, ECF No. 23-3; *id.* Ex. 5, Aff. of M. Younce ¶ 10, ECF No. 23-5. Sgt. Large similarly stated, "I do not prevent offenders from filing lawsuits and do not interfere with their access to the courts." *Id.* Ex. 6, Aff. of T. Large ¶ 14,

---

[8] Thompson apparently raised the same allegations about Mgr. Younce's threatening conduct when he appealed his disciplinary conviction for the April 6 incident. *See* Defs.' Br. in Supp. of Mot. for Part'l Summ. J. Ex. 4, Encl. A to Aff. of A. Crabtree, ECF No. 23-4, at 10–12 (May 26, 2015 Memorandum from Warden Barksdale to Thompson summarizing allegations made in Thompson's "statement of appeal," including Thompson's description of the encounter on April 6 where Mgr. Younce allegedly told Thompson "to stop writing to the Warden, that it made him angry, and something would happen to" him if he continued to complain).

ECF No. 23-6. Mgr. Younce recalled communicating with Thompson "on several occasions about his writing letters to the Warden regarding a number of complaints" between March and July 2015. Younce Aff. ¶ 5. Younce did this "to answer [Thompson's] questions and address his concerns," not to retaliate against him. *Id.* ¶ 11. These affidavits do not address Thompson's assertion that he "repeatedly" asked Mgr. Younce, Lt. Adams, and Sgt. Large for Informal Complaint forms before his 30-day deadline to grieve the April 6 incident expired. Sgt. Fleming and Counselor Huff did not submit affidavits.

After the hearing, and at the Court's request, Defendants submitted a copy of ROSP's Implementation Memorandum that was in effect from September 2012 to October 2015. The memorandum provides in relevant part:

> Informal complaint forms will be available in the buildings during waking hours each day. Offenders must first discuss their issue with the Supervisor to see if it may be resolved before filing an informal complaint form. If the issue cannot be resolved by the Supervisor, the offenders may obtain an informal complaint form. Offenders will only receive an informal complaint form for the issue they have discussed with the Security Supervisor. They will not be given an unlimited supply of informal complaint forms. . . . [A]ll offenders will submit the informal complaint citing in full the problem or concern he wishes to address prior to submitting a regular grievance.

ECF No. 102-1, at 2. This language was amended in the fall of 2015. Under the new policy, Informal Complaint forms would "be made available to offenders via Officers, Supervisors, or Unit Managers." ECF No. 102-1, at 5. Inmates were no longer required to discuss the problem with the "Security Supervisor" before being given a blank Informal Complaint form.

B.  *Hearing Testimony & Demonstrative Evidence*

Defendants called two witnesses to describe how the grievance procedure generally worked at ROSP. Witness Jessica King is the Operational Manager at ROSP. She has held this position since February 2016. King was a counselor at ROSP in the spring and summer of 2015,

9

and she attended training about ROSP's Implementation Memorandum before September 2015. King denied having any first-hand knowledge of Thompson's efforts to obtain Informal Complaint forms during that time. Witness Lt. Gary D. Adams[9] worked in an ROSP housing unit throughout 2015. He was not aware of any policy or practice that only ROSP staff ranked sergeant or above could give out Informal Complaint forms. Both King and Adams testified that ROSP staff do ask the inmate about the underlying problem to see if they can resolve the issue. King testified that staff will "always give" the inmate an Informal Complaint form, even if he does not tell the staff member about the issue. An officer who failed to follow this policy would be "subject to discipline." Adams testified that staff will give the inmate an Informal Complaint form "if the issue can't be resolved." Thompson and Adams did not interact at all during the relevant time.

Thompson testified that he knew how to use the VDOC's grievance procedure and that, based on his experience filing § 1983 actions challenging conditions of his confinement, he understood that he must properly exhaust any administrative remedies that were available to him before bringing his claims to federal court. After the hearing, Thompson submitted a chart showing how many Informal Complaints and Regular Grievances he filed between December 28, 2011, and March 12, 2019. Pl.'s Add'l Evid. 1, ECF No. 99-1. This chart is consistent with Thompson's testimony that he filed dozens of Informal Complaints and Regular Grievances at other VDOC facilities before he was transferred to ROSP on March 26, 2015. Between December 12, 2013, and March 23, 2015, for example, Thompson filed 137 Informal Complaints and 37 Regular Grievances at River North Correctional Center. Pl.'s Add'l Evid. 1. He did not

---

[9] The Adams who testified is not a defendant to this lawsuit. A different Lt. Gary D. Adams, who is a Defendant in this case, retired from the VDOC sometime after November 14, 2017. *See* Adams Aff. ¶ 1.

10

file any Informal Complaints or Regular Grievances between March 26, 2015, and March 8, 2016, at ROSP. *Id.*

At the hearing, Thompson testified that the ROSP correctional officers assigned to restrictive housing units would not give inmates Informal Complaint forms. Thompson asked "everybody" who came by his cell—including Sgt. Large, Lt. Adams, and Mgr. Swiney—for Informal Complaint forms during the relevant time, but they all "refused" his requests once he told them that he wanted to "put in the incidents" about OC spray and his cellmate assaulting him. Thompson did not recall having an opportunity to talk to the Warden or Assistant Warden when they were on the floor in the spring of 2015.[10] Having already been pepper sprayed twice since he arrived at ROSP, Thompson "wasn't going to push [his] luck" by arguing with the staff who refused to give him paperwork.

### III. Discussion

Resolving the exhaustion issue in this case turns largely on whether the Court believes Thompson's testimony about his efforts to access the VDOC's grievance procedure in the spring of 2015. Many of the relevant facts are undisputed, but other material facts require the Court to make credibility assessments. *See Gorham v. Barksdale*, 7:15cv437, 2018 WL 1595628, at *2 (W.D. Va. Mar. 31, 2018). "The Court first addresses the factual findings based on undisputed evidence," *id.*, and then will address factual findings based on its credibility assessments of conflicting, contradictory, or generally contested evidence. The Court makes the following factual findings based on the undisputed evidence in the record:

1. Thompson was incarcerated at ROSP during the relevant time. He arrived at ROSP on

---

[10] Neither party elicited testimony identifying "the Supervisor" or "the Security Supervisor" during the relevant time or describing the official's ability and/or willingness to give out Informal Complaint forms if the inmate's "issue [could not] be resolved" without paperwork. ECF No. 102-1, at 2.

11

March 26, 2015.

2. ROSP operated under OP 866.1, the VDOC's standard *Offender Grievance Procedure*, during the relevant time.

3. OP 866.1 authorized VDOC or ROSP officials to provide some relief for "matters [considered] grievable by offenders," including "[a]ctions of individual employees and/or offenders which affect the grievant personally."

4. Thompson had experience with OP 866.1 before he arrived at ROSP. He filed dozens of Informal Complaints and Grievances while housed at other VDOC facilities.

5. Thompson knew that, under OP 866.1, he had to submit an Informal Complaint form as the first step in the VDOC's regular grievance process.

6. Under OP 866.1, Thompson needed to show that he submitted the Informal Complaint form by attaching one of two approved documents—either a log receipt or a written response—to his Regular Grievance. A properly completed Regular Grievance had to be filed within 30 days of the incident.

7. ROSP had an Implementation Memorandum establishing facility-specific grievance procedures, as required by OP 866.1. ROSP staff received annual training on these grievance procedures.

8. Thompson was housed in A-4, a segregated-housing unit, from late March through early May 2015. Defendant Younce was Unit Manager of the "A" Building during this time.

9. Shortly after arriving at ROSP, Thompson started writing letters to Warden Barksdale. Mgr. Younce spoke to Thompson about these letters while he was housed on A-4.

10. On April 6, 2015, Defendant Crabtree, a correctional officer assigned to A-4, deployed OC spray into Thompson's cell. Sgt. Large arrived shortly afterwards with a video

camera. Lt. Adams filed an incident report about the use of physical force.

11. Thompson received a disciplinary charge for the April 6 incident. Mgr. Younce and Warden Barksdale upheld the disciplinary conviction on review.

12. Although Thompson could not have used OP 866.1 to complain about the disciplinary proceeding or conviction, he could have submitted an Informal Complaint and Regular Grievance alleging that Officer Crabtree used excessive physical force against him on April 6, 2015.

13. Thompson did not submit an Informal Complaint about the April 6 incident. Thus, he never received a receipt or response showing that he made a good faith effort to resolve that issue informally.

14. Thompson was housed in B-6, general-population unit, from June 16 to December 4, 2015. Defendant Swiney was Unit Manager of the "B" Building during that time.

15. On June 17, 2015, Thompson was injured by his cellmate. Thompson could have submitted an Informal Complaint and Regular Grievance alleging that ROSP staff failed to protect him from physical harm.

16. Thompson did not submit an Informal Complaint about the June 17 incident. Thus, he never received a receipt or response showing that he made a good faith effort to resolve that issue informally.

*  *  *

Because there is no dispute that Thompson never submitted Informal Complaints for the remaining claims in this action, he must show by a preponderance of the evidence "that he was prevented, through no fault of his own, from availing himself of that procedure." *Graham*, 413 F. App'x at 663 (citing *Moore*, 517 F.3d at 725); *see, e.g.*, *Woodhouse*, 741 F. App'x at 178–79

13

(pretrial evidentiary hearing); *Gorham*, 2018 WL 1595628, at *7 (bench trial). His ability to do so depends on whether the Court considers his recollection of events to be credible. *Woodhouse*, 741 F. App'x at 178–79; *Gorham*, 2018 WL 1595628, at *7. Having held an evidentiary hearing, the undersigned Magistrate Judge has the "unique opportunity to evaluate the credibility of witnesses," including those who submitted affidavits based on their personal knowledge, and to "weigh the evidence accordingly." *Gorham*, 2018 WL 1595628, at *1. In doing so, I have "considered the consistency of the witnesses' testimony with the undisputed or clearly shown evidence," as well as whether each witness's testimony is internally consistent. *Id.* at *7.

In 2015, Thompson had to request an Informal Complaint form from an ROSP staff member to start the regular grievance process. The parties disagree whether any ROSP employee could provide this form upon request, or whether only certain staff positions had such authority. King testified that any ROSP staff member in a housing unit would have had access to these forms in 2015, and Adams was not aware of any policy in place at that time restricting such access to higher level ROSP officials. This testimony is consistent with Messer's affidavit that an ROSP inmate assigned to segregation, such as Thompson was on April 6, could "ask a correctional officer or other staff for the form, and it [would] be provided to him." Messer Aff. ¶ 11.

Thompson, on the other hand, has long maintained that "only ROSP staff [ranked] sergeant or above" had apparent authority to give Informal Complaint forms to inmates housed in segregation. In Thompson's experience, the officials who worked in these housing units always "disclaim[ed] the capacity," *Ross*, 136 S. Ct. at 1859, to provide the required paperwork. His testimony finds some support in ROSP's written policy from the relevant time that an inmate "*must* discuss [his] issue with *the* Supervisor" before he "may obtain" an Informal Complaint

14

form, and that the inmate would "only receive an [I]nformal [C]omplaint form for the issue [he had] discussed with *the* Security Supervisor." ECF No. 102-1, at 2 (emphasis added). No witness, including Thompson, testified about who held this position (or positions) during the relevant time. Thompson and Adams also both indicated that inmates could discuss an issue with ROSP staff members *who were not* the "Supervisor" before receiving an Informal Complaint form, which conflicts with ROSP's written grievance procedure from the relevant time. This conflict between written policy and stated practice creates confusion about the proper Informal Complaint procedure. *Cf. Ross*, 136 S. Ct. at 1859 ("[W]hen a remedy is . . . essentially 'unknowable'—so that no ordinary prisoner can make sense of what it demands—then it is also unavailable."); *Jones*, 549 U.S. at 218 ("Compliance with prison grievance procedures . . . is all that is required by the PLRA to 'properly exhaust.'").

That said, Thompson is the only witness who has testified, based on *his* personal experience or observation, about how the Informal Complaint process worked in *his* housing units when *he* tried to report the April 6 and June 17, 2015 incidents. Defendants contend generally that Thompson's recollection is inaccurate or incomplete, but they have not presented any admissible evidence specifically contradicting his testimony.

Thompson, King, and Adams each testified that ROSP staff asked about the underlying problem before giving an inmate a blank Informal Complaint form. King and Adams indicated that they did this to resolve the inmate's problem without doing paperwork, but that they would provide the form if needed. Thompson could only speculate about prison officials' purported motive for asking about the underlying problem. Nonetheless, he testified that specific ROSP staff—Mgr. Younce, Mgr. Swiney, Lt. Adams, and Sgt. Large—each failed to give him Informal Complaint forms upon request during the relevant time. As noted, Defendants did not adduce any

15

evidence identifying "the Supervisor" or "the Security Supervisor" during this time or describing the official's ability or willingness to give out Informal Complaint forms if the inmate's "issue cannot be resolved" without paperwork. ECF No. 102-1, at 2. There is no indication that any ROSP official told Thompson he needed to discuss his issue with the "Supervisor" before he could obtain an Informal Complaint form.

Thompson testified not inconsistently with his prior sworn statement that "[s]ergeants and above require offenders (Thompson) to disclose the issue and the ROSP staff involved prior to issuing any IC. If the issue involves them or their staff, they flat-out refuse to provide the IC." Verified Compl. ¶ 77. Both Lt. Adams and Sgt. Large submitted affidavits stating that they "do not interfere with offenders' . . . access to courts" generally, but neither responded to Thompson's specific assertions that they failed to give him an Informal Complaint form, despite his specific requests, to grieve the April 6 incident. *Cf. Kaba*, 458 F.3d at 682, 685–86 (prison-plaintiff's "specific and detailed" affidavits explaining that he asked named individuals for forms, "he could obtain grievance forms and file them only if he pre-disclosed the topic of the grievance to the prison officials, and that they would not provide the form if he intended to file a grievance against them," created genuine dispute over whether prison's admirative remedies were "available" to him). Thompson's sworn assertion that on July 7, 2015, Sgt. Fleming gave him blank Informal Complaint forms and then took them away before ordering him back to his cell, Verified Compl. ¶ 74, while logically at odds with ROSP's "own incentives to maintain functioning remedial processes," *Ross*, 136 S. Ct. at 1859, is not specifically contradicted on the current record. Thompson could have used one of those forms to submit an Informal Complaint about the June 17 incident.

Finally, Thompson's assertion that he "repeatedly" asked ROSP officials to give him

16

Informal Complaint forms is consistent with his documented history of filing dozens of Informal Complaints and Regular Grievances in 2014 and 2016. Clearly, Thompson knew that he had to exhaust his available remedies before bringing his claims to federal court, and he understood how to follow the VDOC's multi-step grievance process—beginning with the fact that he had to prove he submitted an Informal Complaint before filing a Regular Grievance. *See Hill*, 387 F. App'x at 401 ("[T]he fact that Hill successfully filed many grievances in the past suggests that Hill is familiar with the requirements of the administrative process and is not purposefully attempting to evade them."). Thompson's "failure" to file a single Informal Complaint or Regular Grievance in *all* of 2015 is a strange and stark anomoly, and the evidence does not support Defendants' theory that he simply did not take advantage of his "access to . . . informal complaint forms," Messer Aff. ¶ 11.

This is not to say the Defendants were trying to thwart Thompson's efforts to properly exhaust his administrative remedies. The Court rejected Thompson's speculative testimony about these individuals' motives, and there is simply no evidence in the record suggesting that ROSP officials were actively trying to deprive inmates, or Thompson personally, the ability to follow each step of the VDOC's regular grievance procedure. Rather, Thompson has adduced credible evidence showing that an "administrative remedy, although officially on the books, [was] not capable of use to obtain relief," *Ross*, 136 S. Ct. at 1859, on his remaining § 1983 claims *in this case* because he "was prevented, through no fault of his own, from availing himself" of the regular grievance procedure for three months in 2015, *Graham*, 413 F. App'x at 663 (citing *Moore*, 517 F.3d at 725).

## IV. Conclusion

Thompson has shown by a preponderance of the evidence that administrative remedies

were not available to him in this case. Accordingly, I respectfully recommend that his remaining § 1983 claims proceed to trial on the merits.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Honorable Norman K. Moon, Senior United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to the parties.

ENTER: June 28, 2019

Joel C. Hoppe
United States Magistrate Judge