IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| PAUL C. THOMPSON, JR., | ) | |
|     Plaintiff, | ) | Civil Action No. 7:11cv00111 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| H.W. CLARKE, *et al.*, | ) | By: Norman K. Moon |
|     Defendants. | ) | Senior United States District Judge |

This matter is before me on plaintiff Paul C. Thompson, Jr.'s motion for sanctions. (Dkt. No. 132.) Defendants Younce, Swiney, Lt. Adams, Sgt. Large, Sgt. Fleming, and C/O Crabtree ("Defendants") have filed a response in opposition (Dkt. No. 137), and the motion is ripe for disposition. Thompson seeks sanctions against defendants for their alleged failure to preserve video clips that he asserts are relevant to his claims in this matter.[1] In particular, he requests that the court give a spoliation instruction at the trial in this matter.

Having considered the parties' arguments and all pertinent material, I conclude that Thompson has not satisfied his burden of showing that the lost video footage was likely to contain relevant evidence and thus has failed to establish any prejudice from the loss of the footage. For these reasons, discussed in more detail below, his motion will be denied.

I.    BACKGROUND

This case is set for trial on September 9–12, 2019. After prior rulings on motions, there are three claims remaining in the case, all of which are based on alleged events at Red Onion State Prison ("ROSP"), where Thompson is incarcerated:

---

[1] Thompson also voices general complaints about defendants' discovery—many of which he has already raised in other motions—but does not appear to be seeking sanctions for any generalized discovery violations. Moreover, to the extent he has had specific problems with any of defendants' discovery responses, he has filed multiple motions to compel. Thus, like defendants, I "do not construe his motion for sanctions to be seeking sanctions on any issue other than the video evidence." (Resp. to Mot. Sanctions 3 n.5, Dkt. No. 137.) His pending motion to compel, (Dkt. No. 120), and his motion for reconsideration of a ruling on earlier motions to compel (Dkt. No. 129), which raise substantially the same complaints, will be addressed by separate order.

1. An Eighth Amendment failure-to-protect claim against Swiney, in which Thompson alleges that Swiney failed to protect him from violence by another offender, V. Ball, and consequently, that Thompson was injured in a fight with Ball on June 17, 2015.

2. An Eight Amendment excessive-force claim against Crabtree, in which Thompson alleges that, on April 6, 2015, Crabtree sprayed him with Oleoresin Capsicum ("OC") spray[2] through his cell door's tray slot while Thompson was in his cell simply doing legal work.

3. A First Amendment retaliation claim against all six defendants arising from various events during the period of March 27, 2015 to June 9, 2015. The events alleged by Thompson include that these staff members sprayed him with OC spray, deprived him of grievance forms and legal materials, moved him into a cell with OC spray on the toilet, caused the assault by Ball, searched his cell, encouraged another offender to hurt Thompson, and charged him with a false disciplinary charge, all in retaliation for Thompson's writing letters to the warden, using the grievance process, or accessing the courts.

The facts related to Thompson's claims have been set forth in prior opinions, (*e.g.*, Dkt. Nos. 45, 47), and I will not repeat that background here. Instead, I focus on the allegations concerning the videos. Specifically, Thompson's request for sanctions is premised on defendants' non-disclosure of three videos sought in his discovery requests. They are:

1. March 27, 2015 Rapid Eye footage from A-Building, Pod 4, which Thompson believes would show an officer entering his cell—Cell 403—and spraying the toilet seat with OC spray. (Pl.'s Decl. ¶ 1, Dkt. No. 132-1.)

---

[2] OC spray is a chemical agent similar to what is commonly known as pepper spray or mace and irritates a person's eyes, throat, and nose. *See, e.g.*, *Park v. Shiflett*, 250 F.3d 843, 849 (4th Cir. 2001) (describing the physiological effects of OC spray).

2

2. April 6, 2015 Rapid Eye footage from A-Building, Pod 4 from 8:00 a.m. through 11:59 a.m., which Thompson believes would show Defendant Crabtree using OC spray on him "behind a locked cell door." (*Id.* ¶¶ 2, 3.)

3. June 17, 2015 Rapid Eye footage from the B-Building dining hall, Pod #6, which Thompson believes would contain "conversations between offender V. Ball and defendants Swiney and Sgt. Fleming." (*Id.* ¶ 4.)

Thompson also asserts that he sent requests to Warden Barksdale and others in the same and/or following month in which each incident occurred, asking that the Rapid Eye footage be preserved. (*See, e.g.*, *id.* ¶¶ 1–5.)

Previously, counsel had represented that none of the requested footage existed. (Order at 4, Dkt. No. 125.) According to sworn testimony of Lt. Gilbert, an Institutional Investigator, during that time period, Rapid Eye footage was routinely recorded over in the course of operating the Rapid Eye surveillance system.[3] It does not appear that the absent footage Thompson requests was downloaded and saved, and then destroyed. Instead, it appears the clips of video were not downloaded from the surveillance system and saved at any point; they were simply recorded over. As Gilbert explains, if a human being did not download and save the footage, it was automatically recorded over after approximately 90 days. (Gilbert Aff. ¶¶ 12–15, Dkt. No. 137-1.)

Defendants have now located and produced, however, Rapid Eye footage from April 6, 2015, from 11:21 a.m. to 11:46 a.m., a portion of the period Thompson requested. According to Gilbert, that footage likely was preserved because staff reported a use-of-force incident involving Thompson on that date, and during that time-frame. (*Id.* ¶ 11.) The clip was saved, however, on a DVD in another storage area (not the typical location for this type of footage), that area had not

---

[3] All descriptions of the surveillance system refer to it as it existed in 2015 at ROSP. Apparently, there is a newer system in place now that functions differently.

been searched when ROSP staff had looked previously after counsel's request. Gilbert avers that the "failure to locate the video any earlier was inadvertent, and the inaccurate prior statements about its existence were believed to be true when staff previously reported they did not have the video footage Thompson requested." (Gilbert Aff. ¶ 8 n.2.) He also states that immediately upon the clip's discovery, counsel was notified and arrangements have been made or are being made for Thompson to view that footage. (*Id.*)

As for the other two video requests, Gilbert maintains that they do not exist. Gilbert also avers that ROSP's Intelligence Office has no record of any request from Thompson asking for video footage from March 27, 2015, April 6, 2015, or June 17, 2015 in the 90-day period when the footage still would have been available. (*Id.* ¶ 10.) Gilbert further notes that Rapid Eye video footage is "not retained or controlled by staff who are assigned to work in offender housing units," that "[c]orrectional officers and sergeants do not have access to the video surveillance system," and that the only persons with the capability to download and save clips from Rapid Eye video are the Intelligence Officer staff.

Gilbert's affidavit also explains the shortcomings of the Rapid Eye video footage. As relevant here, there is no audio and the PTZ camera usually does not capture incidents occurring inside a cell, even when using the zoom feature via manual remote control. Additionally, he specifically notes that the view of Cell A-403 is partially obstructed because of the cell's location, behind the steps leading to the upper tier of the pod. The video feed is also "very grainy," "of low resolution," and choppy or "jerky," because it only captures approximately 2 to 3 still images per second. (*Id.* ¶¶ 19–22, 27, 29.)

## II. DISCUSSION

A district court's power to sanction a party for spoliation of video evidence derives from both Federal Rule of Civil Procedure 37(e) and the court's "inherent power to control the judicial

4

process and litigation," *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001). Thompson's motion, in which he requests that the court give an adverse inference jury instruction at trial, explicitly requests sanctions under Federal Rule of Civil Procedure 37(e), (Dkt. No. 132), but I will address it under both potential sources of authority.

Rule 37(e) provides the legal framework for evaluating spoliation claims involving otherwise discoverable electronically stored information ("ESI"), including recorded video or audio, that was not preserved for litigation. *Jenkins v. Woody*, No. 3:15cv355, 2017 WL 362475, at *12, *14 (E.D. Va. Jan. 21, 2017). Under the current version of Rule 37(e):[4]

> a movant must satisfy four threshold requirements before a court decides if any spoliation sanction is appropriate: (1) ESI should have been preserved; (2) ESI was lost; (3) the loss was due to a party's failure to take reasonable steps to preserve the ESI; and (4) the ESI cannot be restored or replaced through additional discovery.

*Steves & Sons, Inc. v. JELD-WEN, Inc.*, 327 F.R.D. 96, 104 (E.D. Va. 2018); *see also Jenkins*, 2017 WL 362475, at *13 (stating same four preliminary requirements, although in a different order). If all of these requirements are met, then the court has two options. First, "upon finding prejudice to another party from loss of the information, [the court] may order measures no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1). Second, and "only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation," the court may presume that the lost information was unfavorable to the party who lost it, instruct the jury that it may or must so presume, or dismiss the action or enter a default judgment. Fed. R. Civ. P. 37(e)(2).

The traditional spoliation analysis mirrors Rule 37(e) in many respects, requiring a threshold showing by the moving party that:

---

[4] The current version of the rule is applicable to cases, like this one, commenced after December 1, 2015. In this case, the failure to preserve itself occurred before that date, but I see no prejudice to any party from applying the new Rule 37(e). *See Jenkins*, 2017 WL 362475, at *13 n.28 (applying the new version of the rule where evidence was destroyed prior to December 1, 2015 and the case was filed afterward).

5

> (1) [t]he party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a "culpable state of mind"; and (3) the evidence that was destroyed or altered was "relevant" to the claims or defenses of the party that sought the discovery of the spoliated evidence, to the extent that a reasonable factfinder could conclude that the lost evidence would have supported the claims or defenses of the party that sought it.

*Walker v. Owens*, No. 7:13cv425, 2016 WL 320998, at *2 n.3 (W.D. Va. Jan. 26, 2016) (quoting *Goodman v. Praxair Servs., Inc.*, 632 F. Supp. 2d 494, 509 (D. Md. 2009)); *see Steves & Sons*, 327 F.R.D. at 104 ("This analysis is similar to the Rule 37(e) framework, as it asks whether the responsible party had a duty to preserve, and breached that duty by failing to take reasonable steps to preserve."). "[A]ny level of fault, whether it is bad faith, willfulness, gross negligence, or ordinary negligence" satisfies the culpability element. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 803 F. Supp. 2d 469, 497 (E.D. Va. 2011).

In determining an appropriate remedy or sanction for spoliation, "the nuanced, fact-specific differences among [the] states of mind become significant." *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 539 (D. Md. 2010). For example, "[a]n adverse inference about a party's consciousness of the weakness of his case . . . cannot be drawn merely from his negligent loss or destruction of the evidence; the inference requires a showing that the party knew the evidence was relevant to some issue at trial and that his willful conduct resulted in its loss or destruction." *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir. 1995). Similarly, the harshest sanctions of dismissal and default judgment may only be imposed if the court concludes either "(1) that the spoliator's conduct was so egregious as to amount to a forfeiture of his claim, or (2) that the effect of the spoliator's conduct was so prejudicial that it substantially denied the defendant the ability to defend the claim." *Silvestri*, 271 F.3d at 593. In any event, Thompson bears the burden of proof to establish entitlement to sanctions for

6

spoliation. *Ball v. George Wash. Univ.*, No. 17cv507, 2018 WL 4637008, at *1 (D.D.C. Sept. 27, 2018) ("The burden of proof is on the party alleging spoliation.").

Defendants contend that no sanction should be imposed for three reasons: (1) they personally lacked the duty or ability to preserve the video footage; (2) they did not willfully engage in conduct resulting in the loss of the footage; and (3) the footage is not relevant to Thompson's remaining claims in the case. (Opp'n to Mot. for Sanctions 10, Dkt. No. 37.) Because I agree with the third of these arguments and conclude that it is dispositive of Thompson's request for sanctions, I do not rely on the first two.[5]

Quite simply, as I discuss next, Thompson has not made a threshold showing that the footage would have contained evidence that is relevant to the claims or defenses in this case. Gilbert's undisputed testimony is that Rapid Eye video generally does not show the inside of cells and that the video footage that exists from April 6 (from the shorter time-window) does not show the inside of Thompson's cell. Although Thompson claims that the March 27 footage would show pepper spray being used on a toilet seat *inside his cell*, then, it is extremely unlikely that the Rapid Eye video would either prove or disprove that occurred, since it would not show the inside of his cell, even if it had been preserved.

---

[5] The only evidence Thompson presents that he asked for the preservation of the footage within the ninety-day window before it was automatically recorded over is his declaration, in which he states that he sent multiple requests to non-defendants at ROSP during that time, asking that the footage be preserved. Thompson has not provided any documentation showing that defendants knew of the alleged uses of force against Thompson on the other dates (or different times on April 6, 2015), nor has he shown that these particular defendants had any knowledge of his requests to preserve. In the regular course, moreover, any letters sent to other ROSP officials are supposed to be forwarded to the Institutional Intelligence Office. (Gilbert Aff. ¶¶ 25–26.) But Gilbert's affidavit states that the Intelligence Office, whose personnel are the only people at ROSP with the authority and ability to download and save videos, has no record of a request by Thompson to preserve. (*Id.* ¶¶ 16, 24.) At most, then, Thompson has alleged that non-defendants failed to properly forward his preservation requests. He has not shown any conduct by the named defendants at all related to the failure to preserve, let alone willful conduct by them. As defendants note, courts have taken different positions on whether the failure of the prison generally to preserve may be imputed to individual defendants who are employees. (*See* Defs.' Resp. to Mot. for Sanctions 11–15, Dkt. No. 137 (collecting and discussing authority).) But it is unnecessary to decide that issue in this case. Even if the conduct of others at ROSP can be imputed to defendants, the willfulness of such conduct is dubious, at best.

Similarly, the relevant disputed facts as to the April 6 incident would not have been captured on the Rapid Eye video because the footage does not show what is happening inside Thompson's cell, nor is there any audio. In this case, it is undisputed that OC spray was used on Thompson through the opening in Thompson's cell door tray slot on April 6; the only dispute is *why* it was used. The video would therefore shed no light on the primary dispute as to that claim: whether, as Thompson claims, he was in his cell doing legal work when he was sprayed with OC gas for no apparent reason; or instead, as defendants assert, he was standing on his toilet, threatening to break the sprinkler head in his cell. In short, it is extremely unlikely that the video footage would show what Thompson did, or did not do, immediately preceding the use of OC spray. *See Harvey v. Hall*, No. 7:17cv113, 2019 WL 1767568, at *7 (W.D. Va. Apr. 22, 2019) (denying a request for sanctions under similar circumstances).

Indeed, even the video footage that does exist for April 6, 2019,[6] which shows officers approaching Thompson's cell, extracting him from that cell, and leading him out of the pod, does not show what Thompson was doing in his cell before officers approached him. Thus, the missing video footage for which he seeks sanctions would effectively be irrelevant to the disputed facts in this case as to what occurred on that date. Sanctions are not appropriate for the destruction of irrelevant evidence. *See id.*

As to the third requested clip from June 17, 2015, Thompson argues that this video would contain "conversations between offender V. Ball and defendants Swiney and Sg. Fleming." As noted, however, Gilbert's unchallenged testimony is that the Rapid Eye video footage does not contain audio. Thus, the requested footage would not contain the words of any actual conversations. At most, it would reflect that Ball and those defendants appeared to speak to each other. But absent some other corroborating evidence, it would be pure speculation for Thompson

---

[6] The footage has been submitted as Exhibit 1 to Gilbert's Affidavit.

to suggest what was said during those conversations. And all that he offers is hearsay, in the form of his own declaration, saying that Ball told him defendant Swiney and Fleming "caus[ed] the assault on Thompson." (Pl.'s Decl. ¶ 4.)[7] In the spoliation context, a party must establish relevance "by offering probative evidence, not the hyperbole of argument," that the lost materials were "likely to have been favorable to its case." *E.I. du Pont de Nemours*, 803 F. Supp. 2d at 498; *see also Sampson v. City of Cambridge*, 251 F.R.D. 172, 180 (D. Md. 2008) (explaining that to establish relevance in the spoliation context, a party must show "a reasonable possibility, based on concrete evidence rather than fertile imagination, that access to the lost material would have produced evidence favorable to his cause"). Here, Thompson has not shown that the video footage from June 17, 2016 would have contained relevant evidence, given the absence of any audio.

The lack of relevance translates into a lack of prejudice. *See Knight v. Boehringer Ingelheim Pharma., Inc.*, 323 F. Supp. 3d 837, 845 (S.D. W. Va. 2018) (noting that courts typically find prejudice under Rule 37(e) "when spoliation compromises [another] party's ability to present its case," particularly where the "party 'cannot present evidence essential to its underlying claim'" (quoting *Victor Stanley*, 269 F.R.D. at 532)). Put differently, if the evidence was not relevant, then there can be no prejudice to Thompson from any failure to preserve it and sanctions under Rule 37(e)(1) are not permitted or necessary. *See id.*

Likewise, under Rule 37(e)(2), I have authority to impose sanctions upon a finding of willfulness, but I am not required to do so. Fed. R. Civ. P. 37(e)(2) (listing the sanctions that the court "may" impose). Even if Thompson had shown a willful destruction by defendants of the video evidence, *but see supra* note 5, I would not impose any of the sanctions outlined in Rule

---

[7] Thompson's complaint references an affidavit or other written statement by Ball, but he did not attach that affidavit to his complaint, nor did he provide it in conjunction with his motion for sanctions or point to its location in the record. Thompson has submitted voluminous filings in this case, and I will not review all of them to see if it is elsewhere in the record.

37(e)(2). Those sanctions are all disproportionately severe when compared to the lack of prejudice from the destruction of the materials here—which were extremely unlikely to be useful to any party.

For like reasons, I do not impose sanctions under my inherent authority to do so, either. To do so, I would have to find that the evidence that was destroyed was "relevant" to Thompson's claims, such that a reasonable factfinder could conclude that the lost evidence would have supported his claims. *Walker*, 2016 WL 320998, at *2 n.3. Thompson has failed to make that showing.

### III. CONCLUSION

For all of the foregoing reasons, I conclude that Thompson has not sustained his burden to show spoliation of relevant evidence, and he is not entitled to an adverse inference instruction or any other sanctions based on the loss of the video footage. His motion will be denied in a separate order.

**ENTER**: This __27th__ day of August, 2019.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE